Present: All the Justices

UNITED STATES OF AMERICA

                                              OPINION BY
v.   Record No. 042404        JUSTICE LAWRENCE L. KOONTZ, JR.
                                           June 9, 2005
PETER F. BLACKMAN

        UPON QUESTIONS OF LAW CERTIFIED BY THE UNITED STATES
        DISTRICT COURT FOR THE WESTERN DISTRICT OF VIRGINIA


        Pursuant to Article VI, Section 1 of the Constitution of

Virginia and our Rule 5:42, the United States District Court for

the Western District of Virginia ("district court"), by its

order entered October 21, 2004, certified to this Court the

following questions of law:

        A. In Virginia in 1973, would a conveyance of a
        negative easement in gross by a private property owner
        to a private party for the purpose of land
        conservation and historic preservation be valid?

        B. In Virginia in 1973, would it be valid for a group
        of private property owners to grant to a private
        grantee restrictions for the purpose of land
        conservation and historic preservation on their
        individually-owned parcels of property, when (1) the
        property was not being transferred by a common
        grantor, (2) each grant was made in consideration of
        similar grants to the grantee, and (3) the grantee did
        not own any property benefited by the restrictions?

By order entered January 3, 2005, we accepted the certified

questions.

                              BACKGROUND

        The relevant facts are recited in the order of

certification as follows:

The Green Springs Historic District (the "District") is an area of roughly 14,000 acres in Louisa County that was settled in the 1700s. Much of the land in this area has historically been used for agricultural purposes, and this agricultural setting remains today. Because the land has been continuously farmed for almost three centuries, many of the homes and farms have been preserved in their original context with little alteration.

In the early 1970s, the Commonwealth of Virginia bought two hundred acres of land in the Green Springs area with the intention of building a prison. There was much local opposition, and some landowners expressed the belief that the prison would damage the character of their historic community. Reacting to this opposition, the then-governor of Virginia announced in 1972 that the state would not build the prison facility in the area if that area could be preserved. In response to the governor's challenge, local citizens organized a non-profit group dubbed Historic Green Springs, Inc. ("HGSI"), which obtained donations of easements for land conservation and historic preservation from landowners and initiated an effort to have the area designated as a National Historic Landmark District. The Green Springs Historic District was listed on the National Register of Historic Places in March of 1973, and was ultimately designated as a National Historic Landmark in 1974. See Historic Green Springs, Inc. v. Bergland, 497 F.Supp 839, 842-43 (E.D. Va. 1980) (discussing the history of the District).

By a "Deed of Easement" dated March 19, 1973 (the "Easement"), D.L. Atkins and Frances Atkins granted to HGSI an assignable easement over several parcels of their property, including Eastern View Farm. The Easement states in part that "in consideration of the grant to the Grantee of similar easements in gross by other owners of land in the said Green Springs Historic District for similar purposes, the Grantors [D.L. Atkins and Frances Atkins] do hereby grant and convey to the Grantee [HGSI] an easement in gross restricting in perpetuity, in the manner hereinafter set forth, the use of the following described tracts of land, together with the improvements erected thereon." In 1978, HGSI decided to convey its entire

2

portfolio of easements to the United States. In the resulting deed of easement to the United States, all of the original grantors of similar easements within the District acknowledged their agreement to the conveyance by affixing their signatures to the deed. The National Park Service ("NPS") now administers these easements, including the Easement at issue, on behalf of the United States as part of the Green Springs National Historic Landmark District. The Easement at issue provides that the manor house on Eastern View Farm:

> will be maintained and preserved in its present state as nearly as practicable, though structural changes, alterations, additions, or improvements as would not in the opinion of the Grantee fundamentally alter its historic character or its setting may be made thereto by the owner, provided that the prior written approval of the Grantee to such change, alteration, addition, or improvements shall have been obtained. This provision applies as well to those 18th and 19th Century outbuildings located on the described property.

Peter F. Blackman ("Blackman") purchased Eastern View Farm on July 1, 2002. Blackman wishes to renovate and rehabilitate the manor house. Specifically, Blackman, inter alia, seeks to remove the existing front porch on the manor house, replace the siding, and create an addition. In support of these intended alternations, Blackman submitted several sets of renovation plans to the NPS for review, but the NPS repeatedly denied certain aspects of his plans. Rather than working with the NPS for final approval of his plan, Blackman's attorney stated in a latter dated January 13, 2004 that Blackman would "commence the Rehabilitation at a time of his choosing, without further notice to [NPS], in accordance with the attached elevations." Subsequently, Blackman removed the porch from his house. The United States filed the complaint in this case June 14, 2004, and on June 16, 2004 Judge James C. Turk issued a temporary restraining order restraining Blackman from "commencing and/or continuing renovation work to the manor house located

3

on the Eastern View Parcel, in the Green Springs National Historic Landmark District, unless he has first obtained written approval from the National Park Service."

In defense of his actions, Blackman argues that, inter alia, the original deed of easement granted to HGSI was invalid because at the time it was purportedly created, Virginia law did not recognize any kind of negative easement in gross, including such easements for the purpose of land conservation and historic preservation.

In its order, the district court correctly states that we have not directly addressed the issue of the validity of negative easements in gross in our prior decisions. While also correctly noting that only certain types of easements were recognized at common law, the district court references the statement in Tardy v. Creasy, 81 Va. (6 Hans.) 553, 557 (1886), that "there are many other easements which have been recognized, and some of them have been of a novel kind," for the proposition that prior to 1973 "Tardy leaves open the possibility that other easements, including negative easements related to land conservation and historic preservation, would be valid if sufficiently related to the land."

DISCUSSION

The first question certified by the district court presents the issue of law whether, in 1973, the law of Virginia permitted an individual landowner to grant a negative easement in gross to a third party for the purpose of land conservation and historic

4

preservation.  As indicated by the district court, if the law of this Commonwealth did not recognize the validity of such an easement at that time, then the purported property restrictions granted to HGSI are invalid and would be unenforceable by HGSI's transferee, the United States.

Although previously we have not addressed the issue of the validity of a negative easement in gross under the law existing in 1973, the issue is of considerable significance beyond the specific historic district involved in this case.  By the brief of amici curiae filed in this case, we are advised that at least seven other charitable entities hold conservation or historic preservation easements, many of them easements in gross, conveyed prior to 1973.[*]  Underlying the issue is a degree of apparent conflict between the common law preference for unrestricted rights of ownership of real property and the public policy of this Commonwealth as expressed in Article XI of the Constitution of Virginia, ratified by the people of this Commonwealth in 1970, that "it shall be the policy of this

---

[*] The brief was filed on behalf of Historic Green Springs, Inc., Association for the Preservation of Virginia Antiquities, The Chesapeake Bay Foundation, Inc., Historic Richmond Foundation, National Trust for Historic Preservation in the United States, The Nature Conservancy, Piedmont Environmental Council, and the Waterford Foundation.  These organizations assert that thousands of acres and numerous historically significant sites and buildings located in this Commonwealth are currently protected by easements of the type at issue in this case.

Commonwealth to conserve . . . its historical sites and buildings."  Accordingly, we take this opportunity to discuss in some detail the relevant law.

"An easement is 'a privilege without profit, which the owner of one tenement has a right to enjoy in respect of that tenement in or over the tenement of another person; by reason whereof the latter is obliged to suffer, or refrain from doing something on his own tenement for the advantage of the former.' "  Amstutz v. Everett Jones Lumber Corp., 268 Va. 551, 559, 604 S.E.2d 437, 441 (2004) (quoting Stevenson v. Wallace, 68 Va. (27 Gratt.) 77, 87 (1876); accord Brown v. Haley, 233 Va. 210, 216, 355 S.E.2d 563, 567-68 (1987).  Easements are described as being "affirmative" easements when they convey privileges on the part of one person or owner of land (the "dominant tract") to use the land of another (the "servient tract") in a particular manner or for a particular purpose. Easements are described as being "negative" when they convey rights to demand that the owner of the servient tract refrain from certain otherwise permissible uses of his own land.  Bunn v. Offutt, 216 Va. 681, 684, 222 S.E.2d 522, 525 (1976).

Negative easements, also known as servitudes, do not bestow upon the owner of the dominant tract the right to travel physically upon the servient tract, which is the feature common to all affirmative easements, but only the legal right to object

6

to a use of the servient tract by its owner inconsistent with the terms of the easement.  In this sense, negative easements have been described as consisting solely of "a veto power." Prospect Dev. Co. v. Bershader, 258 Va. 75, 89, 515 S.E.2d 291, 299 (1999).

At common law, an owner of land was not permitted at his pleasure to create easements of every novel character and annex them to the land so that the land would be burdened with the easement when the land was conveyed to subsequent grantees. Rather, the landowner was limited to the creation of easements permitted by the common law or by statute.  See Tardy, 81 Va. (6 Hans.) at 557.  The traditional negative easements recognized at common law were those created to protect the flow of air, light, and artificial streams of water, and to ensure the subjacent and lateral support of buildings or land.  See Andrew Dana & Michael Ramsey, Conservation Easements and the Common Law, 8 Stan. Envtl. L.J. 2, 13 (1989); see also Tardy, 81 Va. (6 Hans.) at 557, 563.

Easements, whether affirmative or negative, are classified as either "appurtenant" or "in gross."  An easement appurtenant, also known as a pure easement, has both a dominant and a servient tract and is capable of being transferred or inherited. It frequently is said that an easement appurtenant "runs with the land," which is to say that the benefit conveyed by or the

7

duty owed under the easement passes with the ownership of the land to which it is appurtenant.  See Greenan v. Solomon, 252 Va. 50, 54, 472 S.E.2d 54, 57 (1996); Lester Coal Corp. v. Lester, 203 Va. 93, 97, 122 S.E.2d 901, 904 (1961).  The four negative easements traditionally recognized at common law are, by their nature, easements appurtenant, as their intent is to benefit an adjoining or nearby parcel of land.  See Federico Cheever, Environmental Law: Public Good and Private Magic in the Law of Land Trusts and Conservation Easements: A Happy Present and a Troubled Future, 73 Denv. U. L. Rev. 1077, 1081 (1996).

In contrast, an easement in gross, sometimes called a personal easement, is an easement "which is not appurtenant to any estate in land, but in which the servitude is imposed upon land with the benefit thereof running to an individual."  Lester Coal Corp., 203 Va. at 97, 122 S.E.2d at 904.  At common law, easements in gross were strongly disfavored because they were viewed as interfering with the free use of land.  Thus, the common law rule of long standing is that an easement is "never presumed to be in gross when it [can] fairly be construed to be appurtenant to land."  French v. Williams, 82 Va. 462, 468, 4 S.E. 591, 594 (1886).  For an easement to be treated as being in gross, the deed or other instrument granting the easement must plainly manifest that the parties so intended.  Prospect Dev. Co., 258 Va. at 90, 515 S.E.2d at 299.

Because easements in gross were disfavored by the common law, they could neither be transferred by the original grantee nor pass by inheritance.  Lester Coal Corp., 203 Va. at 97, 122 S.E.2d at 904.  By statute, however, Virginia long ago abrogated common law restrictions on the transfer of interests in land "by declaring that any interest in or claim to real estate may be disposed of by deed or will."  Carrington v. Goddin, 54 Va. (13 Gratt.) 587, 599-600 (1857) (internal quotation marks omitted).  Pursuant to this statutory change in the common law rule, currently embodied in Code § 55-6, we have recognized that an affirmative easement in gross is an interest in land that may be disposed of by deed or will.  City of Richmond v. Richmond Sand & Gravel Co., 123 Va. 1, 9, 96 S.E. 204, 207 (1918).  Following this Court's decision in Lester Coal Corp., which in dictum made reference to the common law rule that easements in gross remained non-transferable by deed or will, 203 Va. at 97, 122 S.E.2d at 904, Code § 55-6 was amended "to make clear the transferability of easements in gross."  1962 Va. Acts ch. 169. Since 1962, Code § 55-6, in pertinent part, has expressly provided that "[a]ny interest in or claim to real estate, including easements in gross, may be disposed of by deed or will." (Emphasis added).  We subsequently acknowledged the intent of this statutory amendment in Corbett v. Ruben, 223 Va.

9

468, 472 n.2, 290 S.E.2d 847, 849 n.2 (1982) and Hise v. BARC Elec. Coop., 254 Va. 341, 344, 492 S.E.2d 154, 157 (1997).

Code § 55-6 unambiguously speaks to "easements in gross" as interests in real estate capable of disposition by deed or will. There is no suggestion in this language that the statute was intended to apply only to affirmative easements in gross and not to negative easements in gross. The significance of this statutory change in the common law is manifest. Easements in gross, whether affirmative or negative, are now recognized interests in real property, rather than merely personal covenants not capable of being disposed of by deed or will as was the case under common law. Moreover, as pertinent to the present inquiry, such was the case well before 1973 in this Commonwealth.

The 1962 amendment and clarification of Code § 55-6 with regard to the transferability of easements in gross has facilitated, in part, Virginia's long recognition of the value of conserving and preserving the natural beauty and historic sites and buildings in which it richly abounds. In 1966, the General Assembly enacted the Open-Space Land Act, 1966 Va. Acts ch. 461. This Act, currently found in Code §§ 10.1-1700 through -1705, is intended to encourage the acquisition by certain public bodies of fee simple title or "easements in gross or such other interests in real estate" that are designed to maintain

10

the preservation or provision of open-space land.  Code § 10.1-1703.  By definition, open-space land includes land that is preserved for "historic or scenic purposes."  Code § 10.1-1700. Additionally, in 1966, the General Assembly enacted statutes creating the Virginia Outdoors Foundation, 1966 Va. Acts. ch. 525, and the Virginia Historic Landmarks Commission, 1966 Va. Acts ch. 632.  As currently expressed in Code § 10.1-1800, the purpose of the Virginia Outdoors Foundation is "to promote the preservation of open-space lands."  The Virginia Historic Landmarks Commission, now known as the Virginia Board of Historic Resources, was charged with the designation of historic landmarks and districts.  1966 Va. Acts ch. 632, § 4(A).  These statutes evince a strong public policy in favor of land conservation and preservation of historic sites and buildings.

As noted above, this public policy was expressly embodied in Article XI of the Constitution of Virginia which, since 1970, has provided:

> § 1. To the end that the people have clean air, pure water, and the use and enjoyment for recreation of adequate public lands, waters, and other natural resources, it shall be the policy of the Commonwealth to conserve, develop, and utilize its natural resources, its public lands, and its historical sites and buildings.  Further, it shall be the Commonwealth's policy to protect its atmosphere, lands, and waters from pollution, impairment, or destruction, for the benefit, enjoyment, and general welfare of the people of the Commonwealth.

§ 2. In the furtherance of such policy, the General Assembly may undertake the conservation, development, or utilization of lands or natural resources of the Commonwealth, the acquisition and protection of historical sites and buildings, and the protection of its atmosphere, lands, and waters from pollution, impairment, or destruction, by agencies of the Commonwealth or by the creation of public authorities, or by leases or other contracts with agencies of the United States, with other states, with units of government in the Commonwealth, or with private persons or corporations.

In further support of this public policy, the General Assembly in 1988 enacted the Virginia Conservation Easement Act ("VCEA"), Code §§ 10.1-1009 through -1016.  In pertinent part, as defined in the VCEA a conservation easement is "a nonpossessory interest of a holder in real property, whether easement appurtenant or in gross . . . the purposes of which include retaining or protecting natural or open-space values of real property . . . or preserving the historical, architectural or archaeological aspects of real property."  Code § 10.1-1009.

Mindful of this background, we now consider the validity of the negative easement in gross granted to HGSI by the Atkinses in the 1973 deed and subsequently conveyed, with the Atkinses' concurrence, to the United States in 1978.  The validity of that easement is dependent upon whether it was a type of negative easement that would have been recognized by the law of Virginia in 1973.  For the reasons that follow, we conclude that the 1973 deed created a valid easement.

Blackman contends that a negative easement in gross for the purpose of land conservation and historic preservation was not valid in this Commonwealth until 1988 with the enactment of the VCEA. The thrust of this contention is that the VCEA would have been unnecessary if such easements were already valid. We are not persuaded by this contention.

Blackman's contention suggests an analysis devoid of due consideration of the pertinent statutory and constitutional provisions in effect in the Commonwealth long before the 1988 enactment of the VCEA. As discussed supra, Code § 55-6 since at least 1962 has recognized easements in gross, whether affirmative or negative, as interests in real property capable of being transferred by deed or will. Because easements in gross were not transferable at common law and, indeed, were strongly disfavored, it is self-evident that this statute materially changed the common law and recognized "interest[s] in or claim[s] to real estate" beyond those traditionally recognized at common law. Moreover, in the subsequent 1966 enactment of the Open-Space Land Act, the General Assembly specifically recognized easements in gross when it authorized acquisition by certain public bodies of easements in gross in real property which is preserved for historic purposes. Such easements under that Act, under certain circumstances, would be negative easements in gross. Accordingly, while we continue to

13

be of opinion that "the law will not permit a land-owner to create easements of every novel character and attach them to the soil," Tardy, 81 Va. (6 Hans.) at 557, the easement at issue in the present case is not of a novel character and is consistent with the statutory recognition of negative easements in gross for conservation and historic purposes.

More specifically, it does not necessarily follow that conservation easements were not valid in this Commonwealth prior to the enactment of the VCEA. There is ample evidence that similar interests in land were already recognized by statute under the Open-Space Land Act. Moreover, as referenced by the amici curiae in their brief, it is a matter of public record that conservation easements or similar interests in land, far from being unique to the Historic Green Springs conservation effort, have been in common use in Virginia for many years before the adoption of the VCEA.

In enacting the VCEA, the General Assembly undertook to comprehensively address various land interests that can be used for conserving and preserving the natural and historical nature of property. In so doing, the General Assembly addressed the use of such easements in a manner consistent with Code § 55-6, the Open-Space Land Act, and the public policy favoring land conservation and preservation of historic sites and buildings in the Commonwealth as expressed in the Constitution of Virginia.

14

The readily apparent purpose of the VCEA was to codify and consolidate the law of conservation easements to promote the granting of such easements to charitable organizations. When so viewed, it is clear that the VCEA did not create a new right to burden land by a negative easement in gross for the purpose of land conservation and historic preservation. Rather, it facilitated the continued creation of such easements by providing a clear statutory framework under which tax exemptions are made available to charitable organizations devoted to those purposes and tax benefits and incentives are provided to the grantors of such easements.

The fact that such easements were being conveyed without these benefits and incentives prior to the enactment of the VCEA does not support Blackman's contention that these easements were invalid at that time. To the contrary, Virginia not only was committed to encouraging and supporting land conservation and the preservation of historic sites and buildings in the Commonwealth, as evidenced by the constitutional and statutory expressions of that public policy discussed supra, but also recognized negative easements in gross created for these purposes as valid in 1973. Indeed, as noted by the district court, the granting of conservation easements by the landowners in the Historic Green Springs District was the direct result of

15

the encouragement by the Governor for the express purpose of preserving the historic and natural beauty of that unique area.

For these reasons, we hold that the law of Virginia in 1973 did recognize as valid a negative easement in gross created for the purpose of land conservation and historic preservation. Accordingly, we answer the first certified question in the affirmative.

Because we deem our answer to the first certified question to be dispositive, we will not address the second certified question.

<u>First certified question answered in the affirmative</u>.